**UNITED STATES of America**

v.

**Babo Beazley LOE (1), Cornelius Dewitte Loe, Jr. a/k/a C.D. Loe, Jr. (2), Loe's Highport, Inc. (3).**

**No. 4:97CR71.**

United States District Court,
E.D. Texas,
Sherman Division.

March 31, 1999.

H.S. Garcia and Randall Blake, AUSA, Sherman, TX, Robert C. Dalton, AUSA, Beaumont, TX and Gregg A. Marchessault, AUSA, Tyler, TX, for plaintiff.

Douglas D. Mulder, Dallas, TX, Samuel J. Buffone, Ropes & Gray, Washington, D.C., Cynthia Shea Goosen, Cooper, Aldous & Scully, Sherman, TX, Charla Glass Aldous, Austin, TX, William M. Ravkind, Ravkind & Ravkind, Dallas, TX, for defendant.

### MEMORANDUM OPINION AND ORDER

PAUL N. BROWN, District Judge.

On this day came on for consideration Defendants' Motion to Set Aside the Special Verdicts of Forfeiture with Incorporated Memorandum of Law, and after consideration of the motion, response, Defendants' supplemental brief, the Government's supplemental brief, the evidence presented at trial, the evidence and argument presented at the sentencing hearing which began on March 2, 1999, the Government's Supplemental Brief Regarding Forfeiture of Florida Real Property[1], and Defendants' Supplemental Memorandum Regarding Forfeiture of Real Property, the Court is of the opinion that Defendants' motion should be granted in part and denied in part.

### Introduction

Defendant Cornelius DeWitte Loe, Jr. ("C.D.Loe") and his wife Defendant Babo Beazley Loe ("Babo Loe") operate Defendant Loe's Highport, Inc. ("LHI" and col-

1. On March 4, 1999, the third day of the sentencing hearing in this case, the Government informed the Court it was changing its position as to forfeiture of the Florida property. Up until this point, the Government asserted that the entire Florida property was forfeited as property involved in the money laundering offense. Now, while the Government maintains that the entire Florida property is subject to forfeiture as property involved in the money laundering offense, the Government believes Defendants are entitled to a return of the amount of non-tainted funds that were used to purchase the property. In light of this unexpected change, the Court ordered the parties to submit briefing on the Government's new position.

lectively with C.D. Loe and Babo Loe, the "Loe Defendants"), a resort and marina consisting of approximately 796 boat slips, gas docks, boat repair facilities, restaurants, boat sales operations, and retail stores located on Lake Texoma in Pottsboro, Texas.[2] Along with three other individuals, the Loe Defendants were charged in a thirty-one count superseding indictment with violations of various federal statutes. Additionally, pursuant to Title 18, United States Code Section 982, the Government sought forfeiture of the Loe Defendants' real property in Ft. Lauderdale, Florida (the "Florida property"), $910,100.10 in cash proceeds, and all legal rights, including all improvements on the leasehold premises, under the lease agreement between the United States of America and LHI (the "lease rights").[3]

The Court severed the trials of certain Defendants named in the superseding indictment—one trial began on July 6, 1998, and the other trial began on September 14, 1998.[4] In the first trial, the jury found the Loe Defendants guilty of conspiracy to commit mail and wire fraud in violation of Title 18, United States Code Section 371 based on fraudulent insurance claims submitted by the Loe Defendants for flood damage suffered by LHI in 1990. Also, the jury found Babo Loe and LHI guilty of seven money laundering offenses in violation of Title 18, United States Code Section 1957 for engaging in monetary transactions involving the proceeds of the false insurance claims. After finding the Loe Defendants guilty of these offenses, the jury returned a special verdict of forfeiture and found that the Loe Defendants' Florida property, $790,100.56 in cash proceeds, and the lease rights were forfeited to the

United States. In its special verdict of forfeiture, the jury found that the cash proceeds and the lease rights were involved in the money laundering violations charged in Counts 22–24 and 29–31 of the superseding indictment and that the Florida property was either involved in or traceable to the money laundering offense described in Count 25.

In the second trial, the jury found Babo Loe and LHI guilty of conspiracy to defraud the United States Army Corps of Engineers (the "Corps") in violation of Title 18, United States Code Section 371 based on false statements made by such Defendants when reporting lease rent payments to the Corps. Additionally, the jury found Babo Loe and LHI guilty of the following violations: (1) false statements to the Corps in violation of Title 18, United States Code Section 1001; (2) certain tax violations under Title 26, United States Code Section 7206 arising from making false statements in a tax return or aiding another to do so; (3) conspiracy to commit mail and wire fraud in violation of Title 18, United States Code Section 371 by submitting fraudulent insurance claims for tornado damage suffered by LHI in 1994; and (4) mail fraud in violation of Title 18, United States Code Section 1341. However, the jury found Babo Loe and LHI not guilty of three money laundering violations that involved the tornado insurance proceeds received from insurance claims, and the jury found C.D. Loe not guilty on all counts for which he was tried in the second trial.

Babo Loe and LHI (hereinafter "Defendants") file their Motion to Set Aside the

---

2. While the evidence presented at trial was unclear as to the exact ownership of LHI, it appears that C.D. Loe owns 72.5% individually or jointly with Babo Loe. In his Notice of Ownership Interest that was filed on March 1, 1999, Cornelius DeWitte Loe, III, one of C.D. Loe and Babo Loe's sons, contends he owns 27.5% of LHI's outstanding stock. Regardless of actual ownership, the evidence indicated Babo Loe acted as an owner of LHI.

3. On March 4, 1976, C.D. Loe entered into a lease agreement with the United States of America, which permitted him to operate a marina facility on Lake Texoma. The lease was assigned to LHI on March 25, 1991.

4. A third trial is scheduled to begin in July of 1999 for the remaining Defendant named in the superseding indictment.

Special Verdicts of Forfeiture with Incorporated Memorandum of Law and request the Court to set aside the special verdict of forfeiture as to the lease rights and the Florida property because such verdict is contrary to law, unsupported by the facts, and constitutes an excessive fine.

### Legal Standard for Reviewing Whether to Set Aside a Jury Verdict

Federal Rule of Criminal Procedure 29(c) provides in relevant part:

> If the jury returns a verdict of guilty or is discharged without having returned a verdict, a motion for judgment of acquittal may be made or renewed within 7 days after the jury is discharged or within such further time as the court may fix during the 7–day period. If a verdict of guilty is returned the court may on such motion set aside the verdict and enter judgment of acquittal.

■ The proper standard of review for a Rule 29(c) motion is whether, when "viewing all the evidence and drawing all reasonable inferences in favor of the verdict, a reasonable trier of fact could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." *United States v. Rasco*, 123 F.3d 222, 228 (5th Cir.1997), *cert. denied*, — U.S. —, 118 S.Ct. 868, 139 L.Ed.2d 765 (1998). However, since the preponderance of the evidence standard applied to the forfeiture proceedings, *see United States v. Voigt*, 89 F.3d 1050, 1082–83 (3d Cir.), *cert. denied*, 519 U.S. 1047, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996); *United States v. Myers*, 21 F.3d 826, 829 (8th Cir.1994), cert. denied, 513 U.S. 1086, 115 S.Ct. 742, 130 L.Ed.2d 643 (1995), the Court finds that this standard, as opposed to the reasonable doubt standard, should apply. Therefore, the Court must inquire as to whether the evidence is sufficient to permit a reasonable jury to conclude that the government has proven, by a preponderance of the evidence, that the lease rights and the Florida property are subject to forfeiture pursuant to Title 18, United States Code Section 982.

### Discussion

The Court will first address Defendants' argument that the properties are not subject to forfeiture under Section 982, followed by their contention that the special verdict of forfeiture violates the Excessive Fines Clause of the Eighth Amendment.

## I. Forfeiture under 18 U.S.C. § 982

### A. The Lease Rights

#### 1. Applicable Law

■ In this case, the government sought forfeiture under Title 18, United States Code Section 982(a)(1). The statute reads in relevant part as follows: "The court, in imposing sentence on a person convicted of an offense in violation of [S]ection ... 1957 ... of this [T]itle, shall order that the person forfeit to the United States any property, real or personal, *involved in such offense, or any property traceable to such property.*" 18 U.S.C. § 982(a)(1) (Supp.1998) (emphasis added). Defendants were tried under the money laundering statute found at Title 18, United States Code Section 1957. This statute imposes a criminal penalty on any individual who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property that is of a value greater than $10,000 and is derived from specified unlawful activity...." 18 U.S.C. § 1957(a) (Supp.1998).

As both sides have pointed out, in *United States v. Tencer*, 107 F.3d 1120 (5th Cir.), *cert. denied*, — U.S. —, 118 S.Ct. 390, 139 L.Ed.2d 305 (1997), the Fifth Circuit was faced with the issue of whether Section 982 forfeiture of property "involved in" a money laundering offense includes property used to facilitate the laundering offense. In *Tencer*, the Government prosecuted an individual for money laundering in violation of Title 18, United States Code Section 1956. Also, pursuant to a facilitation theory of Section 982, the Government sought forfeiture of

an entire bank account, which consisted of tainted and legitimate funds. The Government claimed that the legitimate funds in the account facilitated the money laundering violations by concealing the tainted funds in the account. *Id.* at 1134–35. The facilitation theory was derived from a passage in the legislative history of Section 981, Section 982's civil counterpart, which reads in part: "[T]he term 'property involved' is intended to include the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *Tencer,* 107 F.3d at 1134 (*citing United States v. All Monies ($477,048.62) in Account 90–3617–3, Israel Discount Bank, New York, New York,* 754 F.Supp. 1467, 1473 (D.Haw.1991)) (*citing* 134 Cong.Rec. S17365 (daily ed. Nov. 10, 1988)). While the Fifth Circuit approved of the facilitation theory in *Tencer,* it did not do so unconditionally as it stated, "merely pooling tainted and untainted funds in an account does not, *without more,* render that account subject to forfeiture." *Id.* at 1134 (emphasis added).

In support of its decision, the Fifth Circuit found the reasoning of the Southern District of New York persuasive in its holding that "forfeiture of legitimate and illegitimate funds commingled in accounts was proper as long as the government demonstrated that the defendant had pooled the funds to disguise the nature and source of his scheme." *Id.* at 1135 (*citing U.S. v. Contents of Account Numbers 208–06070 and 208–06068–1–2,* 847 F.Supp. 329, 335 (S.D.N.Y.1994)). Additionally, the Fifth Circuit acknowledged that some courts have required the Government to demonstrate a substantial nexus between the money laundering offense and the property to be forfeited, *see Marine Midland Bank v. United States,* 1993 WL 158542 at *7–8 (S.D.N.Y.1993), *aff'd in part, remanded in part,* 11 F.3d 1119 (2d Cir.1993), while others have required only some nexus, *see United States v. Voigt,* 89 F.3d 1050, 1087 (3d Cir.), *cert. denied,* 519

U.S. 1047, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996).

**2. Defendants' Motion**

While Defendants recognize that *Tencer* applied the facilitation theory to a Section 982 forfeiture, they argue that because *Tencer* involved money laundering in violation of Section 1956, it should be read narrowly. Defendants contend Tencer supports forfeiture based on a facilitation theory only when property has been concealed in violation of a 1956 money laundering offense and not in the context of a Section 1957 money laundering offense. To support this contention, Defendants assert that unlike a 1956 offense, which requires proof regarding the concealment or disguising of the source or location of criminally derived proceeds, a 1957 violation requires no element of concealment. Since concealment is not an element of 1957, Defendants claim that the application of a facilitation theory in the context of a 1957 offense makes no sense.

However, Defendants argue that if the Court holds that the concept of facilitation applies to a 1957 violation, forfeiture can only be sustained when there is a substantial nexus between the money laundering offense and the property sought for forfeiture. Here, Defendants claim there is insufficient proof to support a finding of a substantial nexus between the seven money laundering offenses at issue and the lease rights; therefore, forfeiture cannot stand.

**3. Government's Response**

In response, the Government contends that the facilitation theory applies to Section 982 and its scope is expansive. The Government asserts that the phrase "involved in" should be read to include any property used to facilitate the underlying elements of a money laundering offense— either the specified unlawful activity or the monetary transaction. In application, since mail fraud and wire fraud are each

specified as unlawful activities for purposes of money laundering, any property involved in those offenses is subject to forfeiture as property involved in the money laundering.

Applying this standard, the Government argues that the evidence presented at trial supports forfeiture of the lease rights. The Government contends that LHI's various property interests at the marina were insured, and it was pursuant to insurance claims filed on those properties that Defendants perpetrated their insurance fraud and committed mail and wire fraud. Since the lease rights gave rise to the mail and wire fraud, and these offenses constituted the specified unlawful activities that gave rise to the money laundering counts, the Government argues that Defendants' lease rights directly facilitated the money laundering and thus are forfeitable.

### 4. The Court's Analysis

The plain language of Section 982 requires the forfeiture of any property involved in money laundering or any property traceable to such property. Therefore, the statute requires forfeiture only when the property has a connection to the money laundering offense or is traceable thereto. As the Court stated in its instructions to the jury regarding criminal forfeiture, "It is not sufficient to establish that property was 'involved in' the underlying mail or wire fraud but rather it must also be 'involved in' the money laundering itself." *Instr. of the Ct. to the Jury Re.Crim. Forf.* at 4.

Contrary to Defendants' contention that a Section 982 forfeiture based on a facilitation theory is limited to Section 1956

money laundering offenses, there is no indication that *Tencer* is so limited and this Court will not support such a narrow reading of *Tencer*. Instead, *Tencer* applied the facilitation theory to forfeiture under Section 982 and this Court is bound to follow that ruling. Although *Tencer* did not explicitly specify the level of nexus required to sustain forfeiture under the facilitation concept, the Court believes *Tencer* implicitly requires a substantial nexus. Nevertheless, the Court need not determine the appropriate standard because the Government failed to show sufficient nexus between the money laundering offenses and the lease rights under either standard.[5]

At trial and in its briefs to the Court, the Government suggests a tenuous nexus, if any, between the lease rights and the money laundering offenses. With respect to six of the seven counts of money laundering for which Defendants stand convicted,[6] the evidence at trial indicated at best a distant connection. First, the evidence supporting the money laundering offenses of Counts 22–24 indicated that insurance proceeds defrauded from the Lexington Insurance Company were deposited into a Team Bank account in the name of Babo Loe. *See Govnt's Ex. 4055.* Then, a portion of the funds from this account was wired to a brokerage house and the funds were deposited into four separate bank accounts, one of which was in the name of LHI. *Id.* Next, a portion of the funds from each of the four accounts was used to purchase Fleet National Bank negotiable monetary instruments, and when the instruments matured, all the money was swept into LHI's bank account. *Id.* Sec-

**5.** In instructing the jury on criminal forfeiture, the Court stated:
Property "involved in" a money laundering offense includes the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property that has a substantial nexus with the money laundering offense. Property may have such a substantial nexus, or connection to a money laundering offense when the property makes the con-

duct constituting money laundering less difficult or more or less free from obstruction or hindrance in that it disguises the nature and source of the money laundering scheme.
*Instr. of the Ct. to the Jury Re.Crim.Forf.* at 3.

**6.** The seventh count of money laundering, Count 25, pertains to the Florida property, which is discussed below.

ond, similar to Counts 22–24, the evidence offered on Counts 29–31 indicated that fraudulent insurance proceeds from Lexington Insurance Company were wire transferred to a financial group and the financial group wrote a check payable to Defendants, which was deposited into a certificate of deposit in LHI's name. *See Govnt's Ex. 4058.* Then, the certificate of deposit funds were transferred to Team Bank and placed in a bank account in the name of LHI. *Id.* Next, funds from this account were wire transferred to accounts at Bank United of Texas to purchase certificates of deposit in the names of C.D. Loe, Babo Loe, Babo Loe as trustee for Blume Loe, and Babo Loe or C.D. Loe. *Id.*

While the evidence pertaining to these six counts shows a substantial connection between the money laundering offenses and LHI's bank accounts, the evidence fails to indicate a nexus between the money laundering offenses and the lease rights. The Court finds that the Government failed to offer evidence that the lease rights had a connection to the money laundering offenses themselves, as distinct from the underlying mail or wire fraud conspiracy. Since there was no evidence from which a reasonable jury could have found a nexus between the lease rights and the money laundering offenses, the jury's special verdict regarding forfeiture of the lease rights cannot stand.

### B. The Florida Property

The evidence offered at trial indicated that the Florida property was purchased for $965,000.00 and title to the property was placed in the name of Babo Loe. The purchase was comprised of $507,491.11 of tainted funds and $457,508.89 of untainted funds. According to an appraisal dated October 28, 1998 prepared for the United

States Marshals Service, the Florida property was valued at $1,500,000.00, which indicates the property has appreciated over $500,000.00 in value since its purchase. Determining whether the property is subject to forfeiture under Section 982 and, if so, in what amount raise issues of first impression in the Fifth Circuit.

### 1. Applicable Law

■ As stated above, Section 982 expressly provides for forfeiture of property that is traceable to property that was involved in a money laundering offense. *See* 18 U.S.C. § 982(a)(1). In contrast to property involved in a money laundering offense, "property 'traceable to' means property where the acquisition is attributable to the money laundering scheme rather than from money obtained from untainted sources." *United States v. Bornfield,* 145 F.3d 1123, 1135 (10th Cir.1998) (citations omitted). "In other words, proof that the proceeds of the money laundering transaction enabled the defendant to acquire the property is sufficient to warrant forfeiture as property 'traceable to' the offense."[7] *Id.*

### 2. Defendants' Motion

Defendants contend that the Florida property is not forfeitable under Section 982 as property traceable to property that was involved in a violation of Section 1957. Defendants cite *United States v. Voigt,* 89 F.3d 1050 (3d Cir.1996), *cert. denied,* 519 U.S. 1047, 117 S.Ct. 623, 136 L.Ed.2d 546 (1996), for the proposition that when property subject to forfeiture is commingled with untainted property, the Government cannot forfeit the property as property traceable to; instead, forfeiture must be sought pursuant to the substitute asset provision.[8] Stated another way, to seek

---

**7.** These instructions regarding the meaning of the phrase "traceable to" were provided to the jury in the Court's instructions. *See Instr. of the Ct. to the Jury Re.Crim.Forf.* at 4.

**8.** Section 982(b)(1) incorporates the substitute asset provision of Title 21, United States

Code Section 853, which provides in relevant part: "If any of the property ... [subject to criminal forfeiture], as a result of any act or omission of the defendant ... has been commingled with other property which cannot be divided without difficulty ... the court shall

forfeiture as property traceable to, the property must have been acquired entirely with tainted funds. Because the Florida property was purchased with commingled funds, Defendants claim forfeiture of the property as property traceable to the proceeds of money laundering activity cannot stand. Instead, the Government must seek forfeiture under the substitute asset provision, and under *United States v. Pergler*, 1998 WL 887113 (N.D.Ill.Dec.7, 1998), the amount subject to forfeiture is limited to $507,491.11, the amount of the tainted funds.[9]

### 3. The Government's Response

In response, the Government asserts that the entire Florida property is subject to forfeiture as property involved in a money laundering offense because the purchase of the property was the money laundering transaction charged in Count 25. However, since $457,508.89 of legitimate funds were used to purchase the property, the Government maintains that Defendants are entitled to a return of this amount under the Eighth Amendment.

The Government points to the Relation Back Doctrine as support for its argument that the entire property should be forfeited. Under this doctrine, the Government contends that all right, title, and interest in

the Florida property vested in the United States upon the purchase of the property in 1993; therefore, all appreciation in the property belongs to the United States. In addition to the Relation Back Doctrine, the Government asserts that *United States v. Hawkey*, 148 F.3d 920, 927 (8th Cir.1998), supports this proposition. As to providing Defendants a reimbursement in the amount of $457,508.89, the Government indicates it came to this conclusion after discovering *United States v. 170 Westfield Drive*, 34 F.Supp.2d 107, 117–18 (D.R.I. 1999), a recent opinion which proposes that when a house is purchased with commingled funds, the Government has an interest in the house up to the value of the tainted funds.

### 4. The Court's Analysis

■ With respect to the Florida property, the Court rejects the conclusions of both parties and instead finds by a preponderance of the evidence that 52.6% of the property is subject to forfeiture as property traceable to property involved in a money laundering offense. As to the remaining 47.4% of the property, the Court concludes that the $457,508.89 payment of untainted funds precludes a finding that this portion of the property is subject to forfeiture.[10]

order the forfeiture" of substitute assets. 21 U.S.C. § 853(p)(5) (Supp.1998).

**9.** Additionally, Defendants argue that no judgment of forfeiture relating to the Florida property may be entered as to LHI because the notice of forfeiture as stated in the superseding indictment only sought forfeiture of the Florida property against Babo Loe. In making this argument, it appears to the Court that Defendants have failed to read the forfeiture section of the superseding indictment because it clearly notifies LHI of the property the Government seeks to forfeit. This section states, "BABO BEAZLEY LOE and LOE'S HIGHPORT, INC., shall forfeit to the United States all property, real or personal, involved in the aforementioned offenses and all property traceable to such property, ... including but not limited to the following: 1. REAL PROPERTY ...." *Superseding Indictment* at

45. The superseding indictment specifies the legal description of the Florida property and then states "[s]aid property belonging to and having been acquired by BABO BEAZLEY LOE." *Id.*

**10.** In its Special Verdict of Forfeiture, the jury found that the Florida property was subject to forfeiture as property involved in the money laundering offense or traceable to such property. *See Special Verdict Form* at 2. Even though the jury did not specify on which basis it was determining forfeiture, the Court concludes it has authority to make findings of fact regarding such since criminal forfeiture is a part of sentencing rather than part of the substantive offense. *See* 18 U.S.C. § 982(a)(1). Therefore, the Court finds that the evidence offered throughout the first trial supports a finding by a preponderance of the evidence that 52.6% of the purchase price of

The starting point for evaluating forfeiture of this property requires the Court to determine whether the property is forfeitable as property involved in or as property traceable to property involved in a money laundering offense. The Court concludes that a portion of the Florida property is subject to forfeiture as property traceable to property involved in a money laundering offense. This determination is supported by the charging language in the Superseding Indictment and the meaning of the term "traceable to."

The money laundering offense charged in Count 25 is a transfer by check from the Campbell Dettman & McKinley, Inc., Trust Account to the Raymond A. Posegay Trust Account in the amount of $965,-000.00. *See Superseding Ind.* at 42. Although this transfer was a step in Defendants' efforts to purchase the Florida property, the purchase of the property was not specifically charged in Count 25. Additionally, while the $507,491.11 of tainted funds was itself property involved in a money laundering offense and could have been forfeited as such, once the Florida property was purchased, the property stood in the place of the tainted and untainted funds; therefore, a portion of the property is subject to forfeiture as property traceable to property involved in the money laundering offense.

■ Since the Court finds the Florida property is subject to forfeiture as traceable to rather than involved in, it must now address the issue of how much, if any, of the property is subject to forfeiture. As discussed above, Defendants assert that since the property was purchased with tainted and untainted funds, *United States v. Voigt,* 89 F.3d 1050 (3d Cir.), *cert. denied,* 519 U.S. 1047, 117 S.Ct. 623, 136

L.Ed.2d 546 (1996), directs that the Government cannot seek forfeiture of the Florida property and instead can only seek forfeiture under the substitute asset provision.

Contrary to Defendants' claim, the Court finds *Voigt* distinguishable from this case. *Voigt* involved the purchase of jewelry from an account in which money laundering proceeds were commingled with other funds and numerous intervening deposits and withdrawals occurred before the jewelry was purchased. *Voigt,* 89 F.3d at 1084. In turning to the substitute asset provision, the Third Circuit stated, "[O]nce a defendant has commingled laundered funds with untainted funds—whether in a bank account or in a tattered suitcase—such that they 'cannot be divided without difficulty,' 21 U.S.C. § 853(p)(5), the government must satisfy its forfeiture judgment through the substitute asset provision." *Id.* at 1088.[11]

In contrast, the tracing problems facing the Third Circuit in *Voigt* are not present in this case. The account containing the commingled funds that was used to purchase the Florida property was a constant account, and the only withdrawals from the account were for the purchase of the property. Specifically, the evidence indicated that Defendants received a check from Chubb Insurance Company in the amount of $1,029,915.00, which included $507,-491.11 of fraudulent insurance proceeds. *Govnt's Ex. 2130.* The total funds were used to purchase a certificate of deposit at Team Bank, which later became Bank One, in the name of Mr. or Mrs. C.D. Loe. *Govnt's Ex. 1129.* From this certificate of deposit account, $789,000.00 was withdrawn and combined with $120,000.00 from the sale of a home in Pompano Beach,

---

the Florida property is traceable to property involved in the money laundering offense charged in Count 25.

**11.** The Court notes that Defendants argue that anytime commingling occurs, the Government must satisfy its forfeiture judgment through the substitute asset provision. There

is language in *Voigt* to this effect, 89 F.3d at 1088 n. 24, however, the Court rejects this proposition as it is clearly at odds with *United States v. Tencer,* 107 F.3d 1120 (5th Cir.1997), and it supports a position that undermines the purpose of the forfeiture provisions as it allows the malfeasor to profit from his malfeasance.

Florida. These funds were used to purchase a cashier's check in the amount of $909,000.00 made payable to an escrow agent. *Govnt's Ex. 4014.* This cashier's check was returned to Babo Loe along with a check for $1,000.00. Thereafter, Babo Loe opened a new account at Bank One and deposited these funds. *Govnt's Ex. 4015, 4018.* Within four days, Babo Loe withdrew all the funds in this new account, added $64,655.95 from the Chubb Insurance payout, and purchased a cashier's check in the amount of $975,000.00 made payable to an escrow agent. *Govnt's Ex. 4016.* Four days later, $965,000.00 of this check was deposited into a Nations-Bank account in the name of a third-party trustee to purchase the Florida property. *Govnt's Ex. 4060.* Since no other withdrawals were made, no other assets were purchased, and the account was depleted, the Court's task of tracing the amount of tainted funds that were used to purchase the Florida property is much easier than the Third Circuit's burden in attempting to trace tainted funds in a fluctuating account. Since the account was depleted, it is not difficult to determine that 52.6% of the Florida property, a percentage representing $507,491.11 of the $965,000.00 purchase price, was acquired with tainted funds; therefore, unlike the difficulties facing the Third Circuit, it is not necessary for the Court to resort to the substitute asset provision.

The Court has determined that the Florida property is subject to forfeiture under Section 982, therefore, the Court now must address whether the entire property is subject to forfeiture. As stated above, the Government claims that the Relation Back Doctrine and *United States v. Hawkey,* 148 F.3d 920, 927 (8th Cir.1998), support a finding that the entire value of the Florida property less $457,508.89, the amount of the untainted funds used to purchase the property, should be forfeited.

The Court agrees with the Government's assertion that the Relation Back Doctrine provides that the United States' interest in the Florida property vested at the time of the property's purchase. *See Caplin & Drysdale, Chartered v. United States,* 491 U.S. 617, 109 S.Ct. 2646, 2653, 105 L.Ed.2d 528 (1989). However, the Court disagrees with the Government's contention regarding the amount of the United States' interest. By arguing that the United States' interest vested in the entire Florida property including all of the property's appreciation, the Government would have the Court disregard the facts of the purchase. Before the property's purchase, the United States' forfeiture interest was the $507,-491.11 of tainted funds. Once the property was purchased, the United States' interest in tainted funds was transformed into a proportion of the property equal to the percentage of the tainted funds used to purchase the property. *See United States v. One 1980 Rolls Royce, VIN No. SRL39955,* 905 F.2d 89 (5th Cir.1990) (finding that percentage of properties purchased with legitimate funds were not forfeitable under the drug forfeiture statute of 21 U.S.C. § 881); *United States v. Pole No. 3172, Hopkinton,* 852 F.2d 636 (1st Cir.1988) (finding that Government has a forfeiture interest equal to the portion of the property acquired by drug proceeds). Here, 52.6% of the purchase funds was tainted property, therefore, the United States' interest is limited to this portion. The Court does not believe "that forfeitability spreads like a disease from one [infected dollar] to the entire interest in the property...." *United States v. One 1980 Rolls Royce, VIN No. SRL39955,* 905 F.2d 89, 90 (5th Cir.1990) (citing *United States v. Pole No. 3172, Hopkinton,* 852 F.2d 636, 639–40 (1st Cir.1988)).

Additionally, the Court finds that *United States v. Hawkey,* 148 F.3d 920 (8th Cir. 1998), does not clearly support the Government's proposition that the United States is entitled to all of the Florida property's appreciation. The lack of factual background in *Hawkey* precludes the Court from determining whether Hawkey added value to the motor home after it was pur-

chased or whether Hawkey's contribution of value occurred at the purchase of the motor home.

Finally, based on policy considerations recognized in *United States v. Tencer*, 107 F.3d 1120 (5th Cir.1997), the Court rejects Defendants' claim that *United States v. Pergler*, 1998 WL 887113 (N.D.Ill.Dec.7, 1998), limits the Government's forfeiture to $507,491.11. In evaluating whether it should adopt a facilitation theory of forfeiture, the Fifth Circuit found the following reasoning of the Southern District of New York persuasive:

> [L]imiting the forfeiture of funds under these circumstances to the proceeds of the initial fraudulent activity would effectively undermine the purpose of the forfeiture statute. Criminal activity such as money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme. It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue.

*Tencer*, 107 F.3d at 1135 (quoting *United States v. Contents of Account Numbers 208–06070 and 208–06068–1–2*, 847 F.Supp. 329, 334–35 (S.D.N.Y.1994)).

The Court finds that accepting Defendants' proposition of limiting the Government's interest in forfeiture to the tainted funds would allow the malfeasor to steal money, make an investment, and then profit from his wrongdoing. Such a conclusion undermines the purpose of the forfeiture statute and furthers adverse policy; therefore, the Court declines to adopt such proposition.

In summary, the Court finds that the United States acquired an undivided interest in 52.6% of the Florida property on the date of the property's purchase and Defendants acquired an undivided interest in the remaining 47.4%. By owning an undivided interest in the whole, the United States and the Defendants should share in any appreciation of the property in relation to their ownership interests.

## II. Excessive Fines Clause of the Eighth Amendment

Given the Court's conclusion that the lease rights are not forfeitable, it is not necessary for the Court to address whether forfeiture of the lease rights would violate the Excessive Fines Clause of the Eighth Amendment. However, since the Court finds that a portion of the Florida property is subject to forfeiture, it is necessary to address this issue.

### A. Defendants' Motion

Defendants argue that the jury's forfeiture verdict of the lease rights and Florida property constitutes an excessive fine in violation of the Eighth Amendment. In support of this argument, Defendants contend that the Supreme Court's recent decision in *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), establishes the standard for evaluating whether forfeitures violate the Excessive Fines Clause. In *Bajakajian*, pursuant to Title 18, United States Code Section 982, the Government attempted to forfeit $357,144 in currency that the defendant failed to declare when leaving the country, which was in violation of the currency reporting laws. *Id.* at 2031. The question before the Court was whether forfeiture of the entire $357,144 would violate the Excessive Fines Clause of the Eighth Amendment. *Id.* The Supreme Court held "that a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.* at 2036. Applying this test to the facts of this case, Defendants conclude that forfeiture of the lease rights and the Florida property would be grossly disproportional to the gravity of the money laundering violations for which Defendants were found guilty.

### B. Government's Response

In contrast, the Government argues that *Bajakajian* does not apply to the facts in

this case. The Government claims that the holding in *Bajakajian* is limited to those cases that involve currency reporting violations. Additionally, the Government asserts *Bajakajian* is inapplicable because the Supreme Court found that Bajakajian's crime was solely a reporting offense, of which the $357,144 was not an instrumentality. Here, the Government asserts that the lease rights were an instrumentality of and are tainted by Defendants' criminal activity. Rather than *Bajakajian*, the Government states that the factors set forth in *United States v. Ladum*, 141 F.3d 1328 (9th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 549, 142 L.Ed.2d 457 (1998), are relevant to the Excessive Fine issue.

### C. Court's Analysis

■ The Court concludes that *Bajakajian* clearly holds that the standard for determining whether a punitive forfeiture violates the Excessive Fines Clause is if the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense. *Id.* at 2036. Contrary to the Government's assertion, *Bajakajian* cannot be so narrowly construed to require an excessive fine evaluation only in the context of a currency reporting violation or when the property is not an instrumentality to the offense committed. Instead, *Bajakajian* requires an excessive fine consideration whenever forfeiture is punitive in nature. *Id.* at 2036.

■ Given the Court's finding regarding the lease rights, the Court's Excessive Fines Analysis is limited to determining whether forfeiture of a portion of the Florida property is grossly disproportional to the gravity of Defendants' offense. Under this standard, the Court concludes that forfeiture of 52.6% of the Florida property, a percentage that equates to approximately $789,000.00,[12] would not violate the Excessive Fines Clause. Defendants' money laundering offenses were related to other illegal activities, including a scheme

to defraud insurance companies and a conspiracy to violate the mail and wire fraud statutes. Additionally, $507,491.11 of the approximate $789,000.00 subject to forfeiture constitute proceeds fraudulently obtained from insurance companies. Therefore, the Court finds that forfeiture of 52.6% of the Florida property is not excessive under the *Bajakajian* test and does not violate the Excessive Fines Clause.

### *Conclusion*

For the foregoing reasons, the Court finds that Defendants' Motion to Set Aside the Special Verdicts of Forfeiture should be granted as to the lease rights identified as follows:

All legal rights pursuant to and evidenced by a lease agreement, to include supplemental lease agreements, between the United States of America and C. DeWitte Loe, Jr., dated March 4, 1976, Lease # DACW56–1–76–378 involving Highport Resort on Lake Texoma, Texas, said lease having been assigned to LOE'S HIGHPORT, INC., on March 25, 1991, as approved by the duly authorized representative of the United States of America on April 4, 1991, said property belonging to and having been acquired by LOE'S HIGHPORT, INC., and all improvements on the leasehold premises.

The motion should be denied as to an undivided 52.6% interest in the Florida property and granted as to the remaining undivided 47.4%. The Florida property is identified as follows:

All that lot or parcel of land, together with its buildings, improvements, fixtures, attachments and easements located at 68 Isla Bahia Drive, Ft. Lauderdale, Florida 33316, being the same property more fully described as follows: Lot Five (5), ISLA BAHIA, according to the Plat thereof, recorded in Plat Book

---

12. This valuation is based on the October 28, 1998 appraisal of the property, which is the most recent appraisal value that has been provided to the Court.

47, at page 27, of the Public Records of Broward County, Florida.

On or before ten (10) days from the date of the signing of this Order, the Government shall submit a proposed order of forfeiture to the Court. All relief requested by any party not specifically granted herein is denied.

IT IS SO ORDERED.