**UNITED STATES of America, Plaintiff,**

v.

**REAL PROPERTY IDENTIFIED AS: PARCEL 03179–005R, Legal Description Sec 19 TWN 9, RNG 10, Port St. Joe, Florida, With All Appurtenances and Attachments Thereon, et. al., Defendants.**

**Civil Action No. 01–706 (RBW).**

United States District Court, District of Columbia.

Oct. 21, 2003.

discretion of its sister court in the Northern District of Indiana.

Linda Otani McKinney, U.S. Attorney's Office, Washington, DC, for Plaintiff.

Kenneth Jeffry Loewinger, Loewinger & Brand, P.L.L.C., Joel William Anders, Washington, DC, for Defendant.

Denyse Sabagh, Duane Morris, Harvey Joseph Volzer, Shaughnessy, Volzer & Gagner, Washington, DC, for Claimant.

### MEMORANDUM OPINION

WALTON, District Judge.

This controversy centers around property that the government alleges was obtained through illegal means, and which the government seeks to subject to civil forfeiture. Presently before the Court[1] are the government's motion to strike the claims and answers of two putative claimants, its motion for summary judgment, and the claimants' motion for partial summary judgment. For the reasons that follow, the Court will deny the motion to strike, will grant in part and deny in part the government's motion for summary

---

**1.** The Court has addressed the Petition for Remission or Mitigation of Seized Property filed by the successor personal representative of Ms. Powell's estate in a separate opinion.

judgment, and will deny the claimants' motion for partial summary judgment.[2]

## I. Factual Background

The facts that form the basis of this civil *in rem* action are identical to those that underlie the criminal prosecution of Dr. Kinley Howard. This civil action was filed on March 30, 2001. The government alleges in its complaint that the defendant properties in this case—real property located in St. Joe, Florida[3] and a 1997 Piper Aztec aircraft—were obtained by Dr. Howard with proceeds derived from specified unlawful activity. Specifically, the verified complaint alleges that Dr. Howard "devised a scheme to defraud his aunt's estate depriving her estate and her heirs of approximately $207,000." Verified Complaint for Forfeiture *In Rem* ("Compl.") ¶ 9.

Dr. Howard's scheme began on December 30, 1996, after the death of his aunt, Mildred Powell, who died intestate on July 15, 1996, when Dr. Howard "petitioned the Probate Division of the Superior Court for the District of Columbia ("Superior Court") to be appointed co-personal representative of Ms. Powell's estate along with his mother, Lillian Powell Howard (Ms. Powell's sister) by forging his mother's signature on the petition...." *Id.* The complaint further alleges that Dr. Howard misrepresented in the petition (1) that his mother resided at his home address in Panama City, Florida, despite the fact that his mother was living in a nursing home in Lynchburg, Tennessee; (2) that the address of his podiatry business was actually his home address; (3) that he listed the value of Ms. Powell's estate as $29,500,

when the estate was actually worth over $200,000; and (4) that there were no other family members who were willing to serve as personal representative of the estate. *Id.* The petition also failed to list all of the estate's heirs. *Id.* Furthermore, after Dr. Howard was appointed as the estate's personal representative on January 2, 1997, he failed to notify "certain interested parties of his appointment and transferred over $187,000 in funds from the estate into his own bank accounts for his own personal use and benefit." *Id.*

After acquiring control of the estate funds, Dr. Howard engaged in a series of transactions that were the basis for his criminal convictions of mail and wire fraud pursuant to 18 U.S.C. §§ 1341 and 1343. For example, he mailed letters to each of the four banks which held funds belonging to Ms. Powell, indicating that he was the co-personal representative of Ms. Powell's estate and requested that each account be closed and the funds transferred electronically to one of the two estate accounts he had established in Florida. *Id.* ¶ 11. He also forged his mother's signature on each of these letters. *Id.* Thereafter, between January 1997 and September 1997, Dr. Howard withdrew the funds from the two estate accounts he had established, and transferred $146,253.77 of the estate funds to his personal and business bank accounts with checks drawn on the two estate accounts. *Id.* ¶ 13. He also forged his mother's signatures on "the majority of the[ ] checks [transferring the funds to his personal account]...." *Id.* These transactions formed the basis for the mail and

---

**2.** In light of the Court's ruling in this opinion, it has denied the Motion for an Order Granting a Private Sale of Defendant Real Property filed by Dr. and Mrs. Howard on April 30, 2002.

**3.** On April 17, 2003, the government filed a Notice of Filing *Lis Pendens* with the Court regarding the St. Joe, Florida property, which was also filed with the Gulf County Clerk's Office for the Gulf County, Florida Circuit Court, in Port St. Joe, Florida, on the same date.

wire fraud criminal charges for which Dr. Howard was convicted in his criminal case.[4]

On March 1, 1997, when Dr. Howard's mother died, Dr. Howard failed to notify the Superior Court of her death. *Id.* ¶ 14. In addition, he continued to transfer and deposit over $94,000 of Mildred Powell's estate assets into the two estate accounts he had established, as well as transferring over $142,000 in funds from the two estate accounts into his own personal and business accounts. *Id.* Dr. Howard also continued to forge his deceased mother's signature on the checks drawn on the estate accounts. *Id.* On August 6, 1997, Superior Court Judge Cheryl M. Long issued an order suspending Dr. Howard's fiduciary powers over Ms. Powell's estate. *Id.* ¶ 15. Despite the suspension, Dr. Howard "continued to withdraw over $53,200 in funds from the Emerald Coast estate account by continuing to forge his deceased mother's signature." *Id.* On June 16, 1998, Judge Long issued a second order in which she removed Dr. Howard as the personal representative of Ms. Powell's estate and entered a judgment against him in the amount of $207,589.99. *Id.*

The government alleges that Dr. Howard utilized the proceeds of his illegal activity to purchase real estate located in Port St. Joe, Florida on December 29, 1997, for $202,500.[5] *Id.* ¶ 18. Furthermore, Dr. Howard allegedly used the defendant aircraft, which had been paid for completely by 1995, as collateral for a loan for over $350,000 that he obtained from First National Bank of Northwest Florida ("First National"). *Id.* ¶ 22. The transaction resulted in First National holding a lien against the aircraft in the amount of $85,000.00. *Id.* When Dr. Howard became delinquent on the loan, First Bank demanded payment in full, and on May 15, 2000, Dr. Howard obtained a second mortgage on the St. Joe property in the amount of $300,000, which he used to pay the balance due on his First National loan. *Id.* Thereafter, First National released the lien on the aircraft.[6]

Based on the above facts, the government argues that the defendant real estate and aircraft are subject to forfeiture because they were purchased with the proceeds of bank, wire and mail fraud.[7] *See* Compl. Counts I–III. The government also alleges in Count IV of the complaint that forfeiture is appropriate because, pursuant to 18 U.S.C. § 981(a)(1)(C), both of the properties were purchased with the proceeds "traceable to interstate transportation of stolen property, in violation of 18 U.S.C. § 2314...." This allegation refers to Dr. Howard's removal of United States savings bonds from Ms. Powell's apart-

---

**4.** Dr. Howard also transferred $4,996.73 from Ms. Powell's Federal Employees Group Life Insurance ("FEGLI") program located in New York; $2,214.46 from Ms. Powell's Paine Webber, Inc., investment account maintained in Washington, DC; and $1,006.13 in insurance funds from the Liberty Life Insurance Company which is located in Greenville, South Carolina. Compl. ¶ 12.

**5.** Dr. Howard made a down payment of $29,524.50 and obtained a mortgage for $172,975 from Kentros, Esper, Haddad, & Alley, an investment group. Compl. ¶ 18.

**6.** The 1997 Piper Aztec aircraft was seized by the Federal Bureau of Investigation ("FBI") on October 6, 2001, pursuant to a seizure warrant issued by a magistrate judge of this Court. On March 8, 2002, this Court granted the government's motion for partial default as to the defendant aircraft. However, due to events that are discussed later, *infra* at 7, the Court vacated its partial decree of forfeiture on March 21, 2002.

**7.** The indictment did not charge Mr. Howard with bank fraud. He was found guilty in his criminal case of two counts of wire fraud and one count of mail fraud.

ment located in the District of Columbia to Florida, where he deposited the bonds in one of the two estate accounts he had established. *Id.* ¶ 34. Count V of the complaint alleges that forfeiture is appropriate pursuant to 18 U.S.C. § 1956(a)(1)(B), which makes it a crime to utilize "the proceeds of specified unlawful activity...." *Id.* ¶ 38(a), and 18 U.S.C. ¶ 1957, which criminalizes use of the "proceeds of specified unlawful activity, to wit: bank fraud." *Id.* ¶ 38(b). It is the government's contention that "the defendant aircraft as well as the defendant real property are property involved in or traceable to property involved in a violation of 18 U.S.C. §§ 1956 or 1957 and [are] therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A)[,]" because the properties were involved in transactions involving money laundering. *Id.* ¶ 39.

On September 5, 2003, a jury found Dr. Howard guilty in his criminal case of mail and wire fraud.[8] On December 6, 2002, this Court sentenced Dr. Howard to a forty-six month term of incarceration followed by three years of supervised release. In addition, Dr. Howard was ordered to pay a $20,000 fine and restitution in the amount of $156,813. Dr. Howard filed a notice of appeal of his conviction on December 16, 2002. His appeal is currently pending before the United States Court of Appeals for the District of Columbia Circuit.

## II. Analysis

### A. Plaintiff's Motion to Strike the Claims and Answers of Judy Howard and Kinco Aviation [# 45]

■ The government's Verified Complaint in this action was filed on March 30, 2001. An answer on behalf of the defendant properties was filed by attorney Joel W. Anders on May 1, 2001, however, the government successfully motioned the Court to have that answer stricken because a response to its motion to strike was not timely filed. Accordingly, the motion to strike was treated as conceded. Thereafter, Mr. Anders moved to withdraw as counsel for the defendant properties on November 7, 2001, after his services were terminated by Dr. Howard. Thereafter, the government moved for partial default as to the defendant aircraft, which resulted in a default being entered by the clerk of the court on December 17, 2001. This Court then granted the government's motion for a default judgment against the aircraft on March 8, 2002. Subsequently, Dr. Howard filed a motion for an emergency hearing to challenge the entry of the default judgment, and a hearing on the motion was held on March 14, 2002. At that time, the Court scheduled a full evidentiary hearing for March 20, 2002, to address Dr. Howard's arguments concerning default judgment. At the evidentiary hearing, Dr. Howard represented that it was his belief that his prior attorney (Mr. Anders) had responded to the

---

**8.** Dr. Howard was also found guilty of two counts of money laundering, however, judgments of acquittal were entered on these counts by the Court because the jury's findings did not identify specified unlawful activities from which the funds were acquired by the defendant that were distinct from the alleged money laundering activities. *See United States v. Howard,* No. 02–079, slip. op. at 8 (D.D.C. Feb. 5, 2003); *see also United States v. Seward,* 272 F.3d 831, 836 (7th Cir.2001) ("The transaction or transactions that created

the criminally-derived proceeds must be distinct from the money-laundering transaction because the money laundering statutes criminalize 'transaction[s] in proceeds, not the transaction[s] that create [ ] the proceeds.' ") (quoting *United States v. Mankarious,* 151 F.3d 694, 705 (7th Cir.1998)); *United States v. Butler,* 211 F.3d 826, 830 (4th Cir.2000) (holding that to establish a money laundering offense "the laundering of funds cannot occur in the same transaction through which those funds first become tainted by crime.").

government's verified complaint. This representation resulted in the Court vacating the default judgment and "Dr. Howard [was given] 20 days from [March 20, 2002] to file any pleadings that he deem[ed] appropriate in reference to this forfeiture action." Transcript of Proceedings dated March 20, 2002 ("Tr.") at 73. Dr. Howard's answer to the complaint was filed on April 3, 2002. On that same date, Dr. Howard's wife, Judy Howard, and his company, Kinco Aviation, Inc., filed a claim and answer in this action. The government thereafter filed a motion to strike these claims and the answers on the ground that they were untimely.

It is clear that none of the claimants, with the exception of Citizens' Bank, filed timely answers to this action. Pursuant to 18 U.S.C. § 983(a)(4)(A), "any person claiming an interest in the seized property may file a claim asserting such person's interest in the property ... *except that such claim may be filed not later than 30 days after the date of service of the Government's complaint* ...." (emphasis added). In addition to filing a claim, the persons "asserting an interest in seized property ... *shall file an answer to the Government's complaint for forfeiture not later than 20 days after the date of filing the claim.*" 18 U.S.C. § 983(a)(4)(B) (emphasis added).

The government argues that this Court's order granting Dr. Howard 20 days to file any appropriate pleadings in this matter cannot be read to permit the filings submitted on behalf of Judy Howard and Kinco Aviation. The claimants argue, however, that the basis for this Court granting Dr. Howard additional time to file pleadings, *i.e.*, because Dr. Howard believed that his prior counsel had filed the appropriate papers on his behalf, applies equally

to Mrs. Howard and Kinco Aviation and thus, they should be afforded the same courtesy. For the reasons the Court expressed during the March 20, 2002, hearing regarding Dr. Howard's failure to timely respond to the Verified Complaint in this matter, the Court concludes that it would be inappropriate to deny Mrs. Howard and Kinco Aviation, a company owned by Dr. and Mrs. Howard, the opportunity to also challenge the government's efforts to forfeit the property at issue. *See* Tr. at 71–72. Accordingly, for the same reasons this Court afforded Dr. Howard additional time to challenge the forfeiture, the Court holds that the claims of Judy Howard and Kinco Aviation should not be stricken.

**B. The Government's Motion for Summary Judgment [# 53]**

The government argues that it is entitled to summary judgment pursuant to the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), 18 U.S.C. § 981. According to the government, civil forfeiture is appropriate because the evidence presented at Dr. Howard's criminal trial "establish[es], by a preponderance of the evidence, that the defendant properties [were] derived from proceeds traceable to [Dr. Howard's] fraudulent activities and are property involved in, or traceable to property involved in, the laundering of those proceeds." Memorandum in Support of Motion for Summary Judgment and Decree of Forfeiture ("Pl.'s Mem.") at 12. The government further asserts that it has established that Dr. Howard obtained the defendant properties with proceeds derived from bank fraud, wire fraud, mail fraud, and money laundering.

In opposition, the claimants [9] posit several arguments in support of their position

9. It is not entirely clear whether the defendant properties are represented by the same

counsel who represents the claimants. The government notes that the defendants in this

that the government's summary judgment motion should be denied. First the claimants argue that because the alleged illegal activity from which the proceeds were derived occurred prior to the CAFRA's enactment, the statute is not applicable to this forfeiture proceeding. Claimants' Opposition to Plaintiff's Motion for Summary Judgment and Claimants' Motion for Summary Judgment ("Claimants' Opp'n") at 1–2.[10] Second, the claimants argue that the basis upon which the government seeks to obtain forfeiture of the property is the same as the offenses charged in the indictment filed against Mr. Howard, and thus "double jeopardy bars [a] second punishment." *Id.* at 2. Third, the claimants argue that forfeiture of the property, worth "approximately $2,000,000.00 ... is constitutionally excessive under the Eighth Amendment." *Id.* at 4–5. Fourth, they contend that the properties at issue are owned jointly and because they are "held by the entireties[,]" the interests of "the innocent co-owner[s] [must] be protected." *Id.* at 5. Fifth, the claimants allege that there are material issues of fact that preclude summary judgment being entered against them, namely, whether Dr. Howard's power of attorney for his mother authorized him to sign her name, and whether the heirs knew that Dr. Howard was administering the estate. *Id.* at 7. Finally, the claimants make their own request for summary judgment as to the defendant aircraft, on the ground that the "1977 Piper Aircraft was paid for completely prior to Mildred Powell's death." *Id.* at 8.

**(1) Summary Judgment Standard**

Summary judgment is governed by Federal Rule of Civil Procedure 56. Pursuant to this rule, "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but ... by affidavits or otherwise provided in this rule, must set forth specific facts showing there is a genuine issue for trial." Fed. R.Civ.P. 56(e). The Court must grant the motion for summary judgment "forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is "mandate[d]" after there has been "adequate time for discovery ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment, nonetheless, is a "drastic remedy, [and therefore] courts should grant it with caution so that no person will be deprived of his or her day in court to prove a disputed material factual issue." *Greenberg v. Food & Drug*

---

action are the real and personal properties named in the complaint. The opposition to the government's motion was filed by Harvey Volzer, Esquire, who represents Dr. Howard and two claimants, Mrs. Howard and Kinco Aviation. Counsel of record for the defendant real property is the successor personal representative of Mildred Powell's estate. The fourth claimant, Citizens Federal Savings Bank, is represented by retained counsel, and the record is silent on who represents the

personal property. The Court will refer to the arguments made in the opposition filed by Dr. Howard, Mrs. Howard, and Kinco Aviation as being made on behalf of the claimants to prevent any further confusion.

**10.** The pages of the claimants' opposition are not numbered. Accordingly, the Court refers to the pages in the sequential order in which they were presented to the Court.

*Administration,* 803 F.2d 1213, 1216 (D.C.Cir.1986). Summary judgment is accordingly not appropriate, for example, where "the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance. . . ." *Id.* (citations omitted).

### (2) Is the CAFRA Applicable to this Action?

 Pursuant to the CAFRA, "the amendments made . . . [to the] [Civil Asset Forfeiture Reform Act of 2000 . . . .] shall apply to any forfeiture proceeding commenced on or after the date that is 120 days after the date of the enactment of this Act, [April 25, 2000].'" 8 U.S.C. § 1324.[11] Since the "CAFRA was enacted on April 25, 2000, [its] effective date is August 23, 2000." *United States v. $80,180.00 in U.S. Currency,* 303 F.3d 1182, 1184 (9th Cir.2002). The government's Verified Complaint for Forfeiture In Rem was filed on March 30, 2001, clearly after the Act's effective date. Nonetheless, the claimants argue that the CAFRA is not applicable to this action because "Congress did not direct that the proceeds forfeiture provision applied to conduct occurring before the enactment of the CAFRA." Claimants' Opp'n at 2. In essence, the claimants argue that the CAFRA should not apply retroactively to *events* that occurred prior to its enactment. "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach." *Landgraf v. USI Film Products,* 511 U.S. 244, 280, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). If Congress has done so, "there is no need to resort to judicial default rules." *Id.* How-

ever if the statute does not "contain . . . such express command[,]" it is the Court's responsibility to "determine whether the new statute [sh]ould have retroactive effect, *i.e.,* whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* A statute is generally presumed not to apply retroactively "absent clear congressional intent favoring such a result." *Id.*

At least one court has directly confronted the argument presented by the claimants and rejected it. *See United States v. All Funds on Deposit in Dime Savings Bank of Williamsburg Account No. 58–400738–1,* 255 F.Supp.2d 56 (E.D.N.Y. 2003). There, the claimant was the wife of Dr. Ishar Abdi, who pled guilty to health care fraud in violation of 18 U.S.C. § 1347. *Id.* at 59. When the government instituted a civil forfeiture action against several properties that Dr. Adbi had agreed to forfeit as part of his plea agreement, Ms. Adbi argued that several of the government's claims, which sought "forfeiture of proceeds traceable to a federal health care or mail fraud offense under 18 U.S.C. § 981, fail[ed] to state claims upon which relief [could] be granted." *Id.* at 60. This was so, Ms. Adbi argued, because the "CAFRA cannot apply to the defendant properties because the acts that constituted Dr. Abdi's fraud offenses occurred prior to the effective date of CAFRA, which, [the] claimant argue[d], cannot apply retroactively." *Id.* (citation omitted).

In rejecting the claimant's argument, the court, relying on *Landgraf,* concluded that the statute contained "a clear expression of Congressional intent as to its temporal reach." *Id.* (citation omitted). This was so, the court reasoned, because 8

---

11. There is one exception to when the CAFRA of 2000 became effective, *see* 28 U.S.C. § 2466, which is not applicable to this proceeding.

U.S.C. § 1324 clearly provides that the CAFRA amendments " 'shall apply to any forfeiture proceeding commenced on or after the date that is 120 days after the date of enactment of this Act.' " *Id.* at 60–61 (quoting 8 U.S.C. § 1324) (emphasis in original). The court noted that although "[f]ew courts have had the opportunity to pass on the retroactivity of CAFRA's provisions, . . . those that have done so appear to have looked solely to when the civil forfeiture complaint was filed vis-a-vis the effective date of the Act, and not to when the fraudulent acts underlying the forfeiture action took place." *Id.* at 61. Based on these cases and the statute's language, the court held

> that Congressional intent is clear and express: [the] CAFRA, by its terms, 'shall' apply to all forfeiture cases commenced on or after August 23, 2000. . . . Had Congress wanted to exclude from [the] CAFRA's reach cases that are commenced after the effective date of the Act but where the underlying fraudulent conduct occurred prior to the effective date of the Act, it could have done so. . . . Since it did not, and since there is nothing ambiguous in the statute's language concerning its reach or applicability, there is no need to conduct the *Landgraf* retroactivity analysis.

*Id.* at 61–62 (footnote omitted); *see also United States v. One "Piper" Aztec "F" De Luxe Model 250 23 Aircraft Bearing Serial No. 27-7654057,* 321 F.3d 355, 359 (3d Cir.2003) ("[The] CAFRA applies to 'any forfeiture proceeding commenced on or after [August 23, 2000].' The plain language is clear: the commencement of a forfeiture proceeding can mean only the point when the government first files a complaint for forfeiture in rem under 18 U.S.C. § 981(b)(2). . . . No other interpretation is sensible."); *$80,180.00 in U.S. Currency,* 303 F.3d at 1185–86 (holding that the CAFRA's heightened burden of proof was

not applicable to a civil forfeiture action in which the complaint had been filed on November 9, 1999. "Congress manifested a clear intent to apply [the] CAFRA's heightened burden of proof only to judicial forfeiture proceedings in which the government's complaint was filed on or after August 23, 2000. . . . Because congressional intent is clear, we need not resort to 'judicial default rules' to determine the retroactive scope of the legislation.") (citation omitted); *cf. United States v. Real Property in Section 9,* 241 F.3d 796, 799 (6th Cir.2001) (holding that the CAFRA's heightened burden of proof standard was applicable to a civil forfeiture action that was pending at the time of CAFRA's enactment).

This Court agrees with the *All Funds on Deposit in Dime Savings Bank* court's analysis. The statute, in clear and unambiguous terms, states that it is applicable to *"any forfeiture proceeding commenced on or after [the Act's effective date]."* 8 U.S.C. § 1324 (emphasis added). It would stretch the bounds of logical reasoning to conclude that Congress was unaware "that any civil forfeiture case commenced shortly after the effective date of the Act would, by necessity, be based on activities that occurred prior to the effective date [of the Act]." *All Funds on Deposit in Dime Savings Bank,* 255 F.Supp.2d at 62 n. 7 (citation omitted). Because the Court concludes that Congress' intent that the statute apply to all forfeiture proceedings that are commenced after the Act's effective date is clear, it need not reach the *Landgraf* Court's second analytical step.

In attempting to have the Court reach the opposite conclusion, the claimants reference the Supreme Court's analysis in *Immigration & Naturalization Service v. St. Cyr,* 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), and argue that "Section 21 'does not even arguably suggest

that it has any application to conduct that occurred at an earlier date.' " (quoting *St. Cyr*, 533 U.S. at 317, 121 S.Ct. 2271). However, *St. Cyr* is inapposite to the current situation. There, at issue was whether amendments to the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") were applicable to "conduct that occurred before their enactment. . . ." 533 U.S. at 292, 121 S.Ct. 2271. Specifically, the issue presented to the Court was whether the Acts' amendments that revoked the Attorney General's "authority to waive deportation for aliens previously convicted of aggregated felonies[,]" as authorized by § 212(c) of the Immigration and Nationality Act of 1952, *id.* at 294, 121 S.Ct. 2271, precluded the Attorney General from exercising discretion concerning whether to waive deportation of such individuals. *Id.* at 297, 121 S.Ct. 2271. In holding that the amendments were not applicable retroactively, the Court concluded that there was "nothing in IIRIRA unmistakably indicating that Congress considered the question whether to apply its repeal of § 212(c) retroactively to such aliens." *Id.* at 326, 121 S.Ct. 2271. Therefore, the Court proceeded to the second prong of the *Landgraf* analysis and concluded that "[b]ecause respondent, and other aliens like him, almost certainly relied upon [the likelihood of receiving § 212(c) relief] in deciding whether to forgo their right to trial, the elimination of any possibility of § 212(c) relief by IIRIRA has an obvious and severe retroactive effect." *Id.* at 325, 121 S.Ct. 2271.

The Court finds that the reasoning of *St. Cyr* is not applicable to the present situation. First, the *St. Cyr* Court concluded that the statutes there were ambiguous and therefore proceeded to evaluate their retroactive effect. Here, the Court has concluded that the CAFRA's language re-

garding the reach of its applicability is not ambiguous. While it is true that "[a] statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date[,]" *Landgraf*, 511 U.S. at 257, 114 S.Ct. 1483, in distinguishing *St. Cyr*, the *All Funds on Deposit in Dime Savings Bank* court noted that the "CAFRA is distinguishable from the statute at issue in *St. Cyr*, since its clear language does much more than merely announce an effective date." 255 F.Supp.2d at 62. Rather, the CAFRA states that it "*shall apply to any forfeiture proceeding[s]* " filed after its effective date. 8 U.S.C. § 1324 (emphasis added). As the *All Funds on Deposit in Dime Savings Bank* court stated, this language mirrors "very closely language that the Court in *Landgraf* held would be sufficient to convey a 'determinate meaning.' " *Id.* at 63 n. 9 (quoting *Landgraf*, 511 U.S. at 259–60, 114 S.Ct. 1483 ("[h]ad Congress wished § 402(a) to have such a determinate meaning, it surely would have used language comparable to its reference to the predecessor Title VII damages provisions in the 1990 legislation: that the new provisions 'shall apply to all proceedings pending on or commenced after the date of enactment of this Act.' ")) (citation omitted). Therefore, because the government's complaint was filed on March 30, 2001, clearly after the CAFRA's effective date of August 23, 2000, the Court concludes that the CAFRA is applicable to the current forfeiture proceeding.

### (3) Is This Action Barred by Double Jeopardy or Eighth Amendment Proscriptions?

The claimants next posit that this action is forbidden based on two distinct legal theories—double jeopardy and the Eighth Amendment's prohibition against excessive punishment.

The claimants' first argument, that awarding the government the relief it seeks would violate the constitutional proscription against double jeopardy because this civil forfeiture action is based on the same facts that formed the basis for Dr. Howard's criminal conviction, is easily rejected. In *United States v. Ursery*, 518 U.S. 267, 287, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), the Supreme Court held that "civil forfeiture does not constitute punishment for the purpose of the Double Jeopardy Clause." The Court explained that "Congress [has] long ... authorized the Government to bring parallel criminal procedures and civil forfeiture proceedings, and this Court has consistently found civil forfeitures not to constitute punishment under the Double Jeopardy Clause." *Id.* at 287–88, 116 S.Ct. 2135. To the extent that the claimants suggest anything to the contrary, their position must be rejected.[12] *See also United States v. One Parcel of Real Property Described as Lot 41*, 128 F.3d 1386 (10th Cir.1997) (stating that the defendant's argument "that the forfeiture of his interest in the personal property following his prosecution, conviction, and sentencing for criminal charges arising from the same conduct violated the Fifth Amendment's Double Jeopardy Clause[,]" was "foreclosed by the Supreme Court's recent decision in ... *Ursery*, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 ....").

The claimants next argue "that forfeiture of approximately $2,000,000.00 in property is constitutionally excessive under the Eighth Amendment." Claimants' Opp'n at 4–5.[13] Relying on the Supreme Court's decisions in *Austin v. United States*, 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993) and *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), the claimants posit that the forfeiture in this case, which includes "real and personal property worth approximately $2,000,000.00[,]" would be excessive because "[t]he forfeiture sought by the government is 100 times larger than the $20,000.00 fine imposed by the District Court, and it has no articulable correlation to any injury suffered by the government." *Id.* at 5. The government counters that the *Bajakajian* case is inapplicable to the present civil forfeiture proceeding because that case concerned a criminal forfeiture. Plaintiff's Reply to Claimants' and Putative Claimants' Opposition to Plaintiff's Motion for Summary Judgment and Opposition to Claimants' and Putative Claimants Motion for Summary Judgment ("Gov.'s Reply") at 6. However, even if *Bajakajian* was applicable to this matter, the government argues that the forfeiture would not be excessive

---

**12.** Indeed, the claimants' counsel's citation to the Sixth Circuit's ruling in *United States v. Ursery*, 59 F.3d 568, 573–74 (6th Cir.1995), followed by a notation that the decision was reversed "on other grounds," is a blatant misrepresentation that what occurred in the Supreme Court's ruling left in place what the Sixth Circuit decided regarding claimants' double jeopardy challenge. *See Ursery*, 518 U.S. at 292, 116 S.Ct. 2135. It is clear that the proposition for which counsel cites the Sixth Circuit's opinion, *i.e.*, that "[w]here the government seeks summary judgment in the civil forfeiture case based on a prior criminal conviction, double jeopardy would bar the forfeiture because it is predicated on the same offense as the conviction[,]" was rejected by the Supreme Court. *Id.* ("It is well settled that 'Congress may impose both a criminal and civil sanction in respect to the same act or omission[.]' ") (citation omitted). Moreover, the remaining cases cited by counsel were all decided prior to the Supreme Court's ruling in *Ursery*.

**13.** The defendant real estate was appraised on January 10, 2002, as worth $1,890.000. Pl.'s Mem. at 32. Currently, there are two outstanding mortgages on the property, one in the amount of $163, 685 and the other in the amount of $317,134. *Id.*

because "the statutory fines for a single violation of each offense adds up to $3,860,000, well over the value of the defendant properties." *Id.* at 7–8. Furthermore, the government argues that the scheme perpetrated by the defendant resulted in harm to the United States that "is great and immeasurable." *Id.* at 8.

The Court concludes that it does not need to reach the issue of whether *Bajakajian* is applicable to this civil forfeiture proceeding because it agrees with the government that the forfeiture of the entire Florida property's value would not violate the Eighth Amendment. The Eighth Amendment provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amdt. 8. This clause of the Eighth Amendment, referred to as "[t]he Excessive Fines Clause[,] limits the government's power to extract payments, whether in cash or in kind, as *punishment* for some offense." *Austin*, 509 U.S. at 609–610, 113 S.Ct. 2801 (emphasis in original) (citation omitted). In *Bajakajian*, the defendant, Hosep Bajakajian, was charged with failing to report that he was transporting more than $10,000 in United States currency overseas. 524 U.S. at 325, 118 S.Ct. 2028. Pursuant to the criminal forfeiture statute applicable to Bajakajian's offense, 18 U.S.C. § 982(a)(1), the court was required to " 'order that [a person convicted of an enumerated offense] forfeit to the United States any property . . . involved in such offense, or any property traceable to such property.' " *Id.* at 325, 118 S.Ct. 2028 (quoting 18 U.S.C. § 982(a)(1)). The government sought forfeiture of the entire amount that Bajakajian failed to report, $357,144. 524 U.S. at 325, 118 S.Ct. 2028. In holding that this forfeiture would violate the Eighth Amendment's excessive fines prohibition, the Court held

that the forfeiture of currency ordered by § 982(a)(1) constitutes punishment. The statute directs a court to order forfeiture as an additional sanction when 'imposing sentence on a person convicted of' a wilful violation of § 5316's reporting requirement. The forfeiture is thus imposed at the culmination of a criminal proceeding and requires conviction of an underlying felony. . . .

*Id.* at 328, 118 S.Ct. 2028 (citation omitted). The Court further held that "a punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense." *Id.* at 334, 118 S.Ct. 2028. The Court concluded that forfeiture of the entire amount Bajakajian possessed would be excessive because his "crime was solely a reporting offense." *Id.* at 337, 118 S.Ct. 2028. Specifically, the Court noted that Bajakajian's offense was "unrelated to any other illegal activities[;][t]he money was the proceeds of legal activity and was to be used to repay a lawful debt." *Id.* at 338, 118 S.Ct. 2028. The Court also noted that Bajakajian did

not fit into the class of persons for whom the statute was principally designed: He is not a money launderer, a drug trafficker, or a tax evader. . . . And under the Sentencing Guidelines, the maximum sentence that could have been imposed . . . was six months, while the maximum fine was $5,000. . . . Such penalties confirm a minimal level of culpability.

*Id.* (citations and footnotes omitted).

The circumstances in *Bajakajian* are readily distinguishable from the present matter. Although not determinative, it is significant that the present forfeiture action is a civil *in rem* proceeding against the properties, and not against Dr. Howard personally.[14] However, assuming *arguendo* that the forfeiture in this case can

14. Notably, in *Bajakajian*, the Supreme Court pointed out that traditionally civil *"in rem*

be viewed as punitive, the Court does not find that the forfeiture of the real property would be disproportional to the defendant's guilt. The Supreme Court's basis for holding that the forfeiture sought by the government in *Bajakajian* would be excessive was based on the nature of the defendant's culpability. On this point, the Court noted that Bajakajian did not fall within "the class of persons for whom the statute was principally designed...." 524 U.S. at 338, 118 S.Ct. 2028. Here, however, the civil forfeiture statute at issue in this case is designed to provide for the forfeiture of property obtained through mail and wire fraud, conduct for which the defendant was convicted. For the reasons set forth in this Court's prior Memorandum Opinion denying Dr. Howard's motion for judgments of acquittal, there is overwhelming evidence supporting his conviction. Moreover, unlike Bajakajian's conduct, Dr. Howard did not merely commit an act of failing to report information; rather, he defrauded the Superior Court of the District of Columbia and even ignored an order of that court suspending his fiduciary powers over the estate from which he acquired the funds he used to purchase the St. Joe, Florida property. In addition, he committed numerous transactions in violation of the mail and wire fraud statutes. And, although the jury failed to specify conduct separate from the specified unlawful activity to support the money laundering convictions, which caused the Court to invalidate those convictions, nonetheless, but for this legal flaw, evidence sufficient

to establish violations of the money laundering statute as well was presented by the government. *See United States v. Kinley Howard*, 271 F.Supp.2d 79, 88–89 (D.D.C.2002) (holding that there were sufficient allegations contained in the indictment of specific unlawful activity from which proceeds acquired by the defendant were allegedly laundered).

In *United States v. Loe*, 49 F.Supp.2d 514 (E.D.Tex.1999), the court addressed the issue of whether forfeiture pursuant to 18 U.S.C. § 982, the criminal forfeiture statute at issue in *Bajakajian*, would be violative of the Eighth Amendment. There, the defendants had purchased property in Florida for $965,000.00. *Id.* at 520. "The purchase price was comprised of $507,491.11 of tainted funds and $457,508.89 of untainted funds." *Id.* After the purchase was made, the property had appreciated in value over $500,000, and was worth $1,500,000. *Id.* In rejecting the government's argument that it was entitled to forfeit the full amount of the property's value, the court concluded "that [only] 52.6% of the property [was] subject to forfeiture as property traceable to property involved in a money laundering offense." *Id.* at 521. Because the remaining 47.4% of the property was paid for with untainted funds, the court concluded that it was not subject to forfeiture. *Id.* Most significant for this Court's present purposes was the *Loe* court's conclusion that the government was entitled to 52.6% of the property's total value, in-

---

forfeitures were ... not considered punishment against the individual for an offense[,]" because "[t]he theory behind such forfeitures was the fiction that the action was directed against 'guilty property,' rather than against the offender himself." 524 U.S. at 330–31, 118 S.Ct. 2028 (footnote and citation omitted). Thus, civil *in rem* forfeitures were "considered to occupy a place outside the domain of the Excessive Fines Clause." *Id.* at 331, 118 S.Ct. 2028. However, the *Bajakajian*

Court noted that "some recent federal forfeiture laws have blurred the traditional distinction between civil *in rem* and criminal *in personam* forfeiture [and thus the Court has] held that a modern statutory forfeiture is a 'fine' for Eighth Amendment purposes if it constitutes punishment even in part, regardless of whether the proceeding is styled *in rem* or *in personam*." *Id.* 331 n. 6, 118 S.Ct. 2028 (citations omitted).

cluding "any appreciation of the property in relation to [the government's] ownership interests." *Id.* at 524. The *Loe* court rejected the defendants' argument, which was based on *Bajakajian,* that forfeiture of the entire value of the Florida property would "constitute[ ] an excessive fine in violation of the Eighth Amendment." *Id.* at 524. Although the court recognized that *"Bajakajian* clearly holds that the standard for determining whether a punitive forfeiture violates the Excessive Fines Clause is if the amount of the forfeiture is grossly disproportional to the gravity of the defendant's offense[,]" the court found "that forfeiture of the 52.6% of the Florida property, a percentage that equates to approximately $789,000.00 would not violate the Excessive Fines Clause." *Id.* at 525. This was because the

> [d]efendants' money laundering offenses were related to other illegal activities, including a scheme to defraud insurance companies and a conspiracy to violate the mail and wire fraud statutes. Additionally, $507,491.11 of the approximate $789,000.00 subject to forfeiture constitute proceeds fraudulently obtained from insurance companies. Therefore, the Court [found] that forfeiture of 52.6% of the Florida property [was] not excessive under the *Bajakajian* test and [did] not violate the Excessive Fines Clause.

*Id.*

As already noted, the *Loe* court concluded that the government was entitled to the appreciated value of the property, in proportion to the amount of tainted funds that were utilized to purchase that property. Here, in contrast to the circumstances in *Loe,* no evidence has been proffered which even suggests that any part of the down payment used to purchase the St. Joe, Florida property was from legally acquired funds. Rather, the facts demonstrate that on September 9, 1997, Dr. Howard withdrew $34,623.19 from the Emerald Coast Bank estate account and on the same day opened a personal account at the same bank and deposited into it the funds he had withdrawn from the estate account along with $941.25 of Mildred Powell's funds that had not been previously deposited into any account. Gov.'s Mem. at 22. Thereafter, on September 24, 1997, Dr. Howard deposited an additional $100 of Mildred Powell's funds into his Emerald Coast Bank personal account. *Id.* From the time Dr. Howard opened this personal account until December 22, 1997, when he wrote a check in the amount of $29,524.50 for the down payment on the defendant real property, no other money was deposited into the account. *Id.* Furthermore, the financial documents submitted by the government clearly establish that Dr. Howard's mortgage payments were made with funds traceable to the estate's assets and Dr. Howard has not presented evidence that refutes this evidence.[15] Accordingly, because the Court concludes that the government has demonstrated by a preponderance of the evidence that Dr. Howard

---

15. The claimants failed to comply with this Court's local rule that provides that an opposition to a motion for summary judgment "shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated...." LCvR 56.1. Pursuant to this local rule, "the court *may* assume that facts identified by the moving party in its statement of material facts are admitted, unless such fact is controverted in the statement of genuine issues filed in opposition." *Id.* (emphasis added). Here, a separate statement of material facts as to which there is no genuine issue was attached in support of the claimants' motion for partial summary judgment. Accordingly, the adverse consequences of noncompliance with the local rule will not be invoked by the Court.

utilized funds exclusively acquired from Mildred Powell's estate to purchase and make payments on the St. Joe, Florida property, the entire property, including its appreciated value, is subject to forfeiture. *See United States v. Hawkey,* 148 F.3d 920, 928 (8th Cir.1998) (holding "that the district court correctly ordered that the motor home be forfeited without regard to any increased value that [the defendant] may have added. Irrespective of whether the increased value to the converted property is the result of wise investment, personal effort [by the defendant], or by adding [the defendant's] personal untainted funds, because the converted property is traceable to the unlawful monetary transaction, we conclude that the property is subject to forfeiture under [18 U.S.C. § 982(a)(1)].""). Any contrary result would reward Dr. Howard for his illegal activities by permitting him to profit from the purchase of property that has substantially increased in value. Thus, the Court concludes that forfeiture of the entire value of the St. Joe, Florida property would not violate the Eighth Amendment.

### (4) Is the Forfeiture in this Action Barred by Joint Ownership?

■ Having concluded that the claims of Judy Howard and Kinco Aviation are properly before the Court, it must now decide whether principles that govern joint ownership preclude the entry of summary judgment for the government. The claimants argue that "[i]t is uncontroverted that Kinley W. Howard and his wife Judy Howard own the Port St. Joe's Florida real estate as tenants by the entireties[ ] ... [and] that Kinco Aviation owns the airplane at issue in the instant case." Claimants' Opp'n at 5. Accordingly, the claim-

ants posit that, pursuant to the Florida Constitution, "the innocent co-owner's interest in the property [must] be protected." *Id.* (citing *In re Forfeiture of 1985 Ford Pickup Truck,* 598 So.2d 1070 (Fla. 1992)) (footnote omitted).

The claimants rely on *United States v. One Single Family Residence,* 894 F.2d 1511 (11th Cir.1990) for the proposition that "property held by the entireties is entirely immune from forfeiture." Claimants' Opp'n at 6. As the claimants represent, it is correct that the Eleventh Circuit held in *One Single Family Residence* that the property the government sought to subject to forfeiture there pursuant to 21 U.S.C. § 881(a)(7)[16] could not be forfeited because a criminal defendant and his wife held the property as tenants by the entirety. However, the claimants omit a factor that was key to the court's holding in *One Single Family Residence.* There, the Eleventh Circuit found no reason to reverse the district court's factual conclusion that the criminal defendant's wife had "no knowledge or suspicion of her husband's drug trafficking or the use of their home to facilitate [drug trafficking] deals." Therefore, the Eleventh Circuit's inquiry was limited to the legal question of whether any of the wife's interest in the property, *as an innocent owner,* was specifically protected by section 881(a)(7). *Id.* at 1513. Holding that because the district court had correctly concluded that the wife held the property with her husband as a tenant by the entirety, under Florida common law her "interest comprise[d] the whole or entirety of the property and [was] not a divisible part; the estate [was therefore] inseverable." *Id.* at 1514 (citations omitted). Thus, the court noted that its "deci-

**16.** 21 U.S.C. § 887(a)(1) " 'requir[ed] the forfeiture of any real property and improvements thereon when there is probable cause to believe that the property was used to facilitate a violation of [the drug trafficking statute]....' " *One Single Family Residence,* 894 F.2d at 1512 (citation omitted).

sion [was] not based on Florida law that conflicts with the federal forfeiture statute." *Id.* at 1518. Rather, the court held that *"the federal law protect[ed] an innocent owner's interest,* and when that innocent owner's interest [pursuant to state law] comprises the whole of a property, nothing [could] be forfeited to the government." *Id.* (emphasis added).

As in *One Single Family Residence,* the federal statute here provides for an innocent owner defense. Pursuant to 18 U.S.C. § 983(3)(A), an "innocent owner" as to "a property interest acquired after the conduct giving rise to the forfeiture has taken place" is "a person who, at the time that person acquired the interest in the property—(i) was a bona fide purchaser or seller for value ... and (ii) did not know and was reasonably without cause to believe that the property was subject to forfeiture." However, the Court need not belabor the issue of whether or not Mrs. Howard is an innocent owner pursuant to the statute because this issue is not addressed at all in the claimants' opposition. Furthermore, as Mrs. Howard did not testify at her husband's trial, there is no basis upon which the Court could ascertain whether or not she has a valid argument that she is an innocent owner for purposes of the statute's exemption. The argument that Mrs. Howard is not an innocent owner was raised by the government in its initial motion for summary judgment. Gov.'s Mem. at 39–40. In response, the claimants merely cite cases that stand for the proposition that an innocent owner's interest should be protected, but they otherwise fail to directly address the argument made by the government that Mrs. Howard is not an innocent owner.

▪ Pursuant to this Court's local rules, a memorandum of opposing points and authorities *"shall"* be filed in opposition to a motion and, if such a memorandum is not filed, "the court may treat the motion as conceded." LCvR 7.1(b) (emphasis added); *see also Federal Deposit Ins. Corp. v. Bender,* 127 F.3d 58, 68 (D.C.Cir.1997) (affirming district court's grant of summary judgment where defendant failed to timely file an opposition, stating that " '[w]here the district court relies on the absence of a response as a basis for treating the motion as conceded, we honor its enforcement of the [local] rule.' ") (citation omitted). Courts have interpreted this local rule to apply to specific arguments within a memorandum opposing a motion. Thus, "[i]t is well understood in this Circuit that when a plaintiff files an opposition to a motion to dismiss addressing only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded...." *Hopkins v. Women's Div., General Bd. of Global Ministries,* 238 F.Supp.2d 174, 178 (D.D.C. 2002) (citations omitted); *see also Bancoult v. McNamara,* 227 F.Supp.2d 144, 149 (D.D.C.2002) ("[I]f the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case.") (citations omitted); *Day v. D.C. Dep't of Consumer & Regulatory Affairs,* 191 F.Supp.2d 154, 159 (D.D.C.2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded.") (citation omitted). It is not this "[C]ourt's role ... to act as an advocate for the [the parties] and construct legal arguments on [their] behalf in order to counter those in the motion to dismiss." *Stephenson v. Cox,* 223 F.Supp.2d 119, 122 (D.D.C.2002) (citations omitted). Accordingly, because nothing has been submitted by the claimants upon which the Court can ascertain whether or not Mrs. Howard and Kinco Aviation have valid innocent owner

defenses to the forfeiture of the defendant properties, the Court will treat this argument as conceded and conclude that Mrs. Howard and Kinco Aviation are not innocent owners and thus summary judgment is not precluded on joint ownership grounds.

### (5) Are There are Material Facts Barring Summary Judgment?

Having decided that this action is governed by the CAFRA, that statute's burden of proof provision governs whether the government is entitled to summary judgment. Pursuant to 18 U.S.C. § 983(c)(1), "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture[.]"[17] In meeting this burden, the government may utilize "evidence gathered after the filing of a complaint for forfeiture to establish . . . that [the] property is subject to forfeiture[.]" 18 U.S.C. § 983(c)(2).

### (A) The Real Property

■ Regarding the defendant real estate, the Court, having rejected the claimants' arguments that forfeiture of the real property would violate the Eighth Amendment, and that forfeiture is barred by principles of joint ownership, concludes that summary judgment is warranted in favor of the government. There is ample evidence from the criminal trial of Dr. Howard, over which this Court presided, that demonstrates that the real property was purchased with the proceeds Dr. Howard

acquired exclusively through his mail and wire fraud and money laundering activities. Furthermore, Dr. Howard does not even contest the government's argument that his appropriation of savings bonds which he transported from the District of Columbia to Florida provides a basis for forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), because the property was purchased with proceeds "traceable to interstate transportation of stolen property, in violation of 18 U.S.C. § 2314 . . . ."

■ The claimants argue that there are genuine issues of material fact precluding an award of summary judgment to the government at this time. First, they note that Dr. Howard was not convicted of money laundering. Claimants' Opp'n at 7. However because the Court has concluded that CAFRA is applicable to this action, this argument does not preclude summary judgment as the government need not rely on Dr. Howard's vacated money laundering conviction for the result it desires. In addition, a criminal conviction is not a prerequisite for civil forfeiture. *See One "Piper" Aztec "F" De Luxe Model 250 PA 23 Aircraft,* 321 F.3d at 360 ("[T]he absence of a criminal conviction is irrelevant in a civil forfeiture proceeding, which is directed against the property, not the owner.") (citation omitted); *United States v. All Right, Title & Interest in Real Property & Building Known as 303 West 116th Street, New York, New York,* 901 F.2d 288, 292 (2d Cir.1990) (rejecting claimant's argument that "his state conviction [did] not support forfeiture because he ha[d] filed a

---

**17.** The CAFRA "alter[ed] the burdens borne by the parties to a civil forfeiture proceeding." *All Funds on Deposit in Dime Savings Bank,* 255 F.Supp.2d at 61 n. 5. Previously, "once the government made a showing of probable cause, the burden shifted to the claimant to prove by a higher standard of evidence—preponderance of the evidence— that forfeiture [was] not required." *Real*

*Property in Section 9,* 241 F.3d at 797. Due to "widespread criticism of this regime . . . Congress enacted CAFRA . . . [which] transferred the burden of proof from the claimant to the government and required the government to establish forfeiture by a preponderance of the evidence rather than by the lower probable cause standard[.]" *$80,180.00 in U.S. Currency,* 303 F.3d at 1184 (citations omitted).

notice of appeal from that conviction.... [E]ven if [the claimant's] state conviction were overturned, civil forfeiture of the defendant property would still be warranted.") (citations omitted).

 Second, the claimants argue that there is a genuine issue of material fact regarding whether Dr. Howard had his mother's power of attorney, and accordingly whether signing his mother's signature constituted forgeries because "D.C. Probative [sic] law permitted him to take the actions he did prior to his mother's death." Claimants' Opp'n at 7. To the extent that Dr. Howard made these same unconvincing arguments to the jury, they are also rejected again here. *See United States v. One 1987 Mercedes Benz 300E*, 820 F.Supp. 248, 253 (E.D.Va.1993) (stating that based on the claimant's conviction for extorting money, "[t]he doctrine of issue preclusion or collateral estoppel bar[red] [the claimant's] attempt to relitigate in this civil proceeding an issue of fact fully litigated in a prior criminal proceeding and necessary and essential to the judgment of conviction entered in the criminal matter.") (citations omitted). In addition, it is noteworthy that Dr. Howard continued to sign his mother's name even after she died, and failed to notify the Superior Court about her death, facts that added to the government's proof that he sought to defraud the estate's heirs and the Superior Court.

Third, the claimants argue that there is an issue of material fact regarding wheth-

er the estate's heirs "knew Kinley W. Howard was handling the estate and approved of his doing so." Claimants' Opp'n at 7.[18] Further, the claimants state that pursuant to District of Columbia probate law, "no distribution [was] required until the estate is closed" and it is beyond dispute "that the estate is still open pending the resolution of the Georgia property matters." *Id.* However, these facts are not material to the present controversy. For the purpose of forfeiture, the government must demonstrate, by a preponderance of the evidence, that the property is subject to forfeiture. As stated previously, the Court concludes that the overwhelming evidence of guilt presented at the defendant's criminal trial, which resulted in his conviction, establishes that the defendant real estate was purchased with funds Dr. Howard acquired exclusively through his mail and wire fraud activities. Moreover, the heirs' knowledge that Dr. Howard was administrating the estate does not mean that they also knew he was using estate funds for his own personal purposes, or that he misrepresented the value of the estate and his mother's home address when applying to be a co-representative of the estate. Nor does it change the fact that Dr. Howard continued to spend the estate's funds after a judge suspended his fiduciary powers. These facts, in conjunction with the overwhelming evidence of Dr. Howard's guilt presented at his criminal trial, conclusively demonstrates that Dr. Howard knowingly

**18.** To the extent that the parties cite to the voluminous transcripts in this matter, without designating the pages on which the testimony supporting their arguments could be found, the Court has not endeavored to complete this task on their behalf. As the District of Columbia Circuit has clearly held, this Court does not have an obligation to search the entire record, or an entire witness' testimony for that matter, in search of testimony that supports the parties' arguments. *See Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988) (rejecting "appellant's claim that the 'district court should have examined the entire record when considering [the defendant's] summary judgment motion.... Appellant's failure to designate and reference triable facts was, in light of he language of Rule 56(c) and governing precedent, fatal to its opposition.") (citations omitted).

orchestrated a fraudulent scheme to obtain the proceeds of Mildred Powell's estate. And, he then used those funds to purchase the St. Joe, Florida real estate.

In sum, the Court concludes that the government is entitled to summary judgment as to the St. Joe, Florida real estate.

**(B) The Personal Property**

█ The Court reaches a different conclusion regarding the government's summary judgment motion to forfeit the defendant aircraft. The airplane was purchased by Dr. Howard in 1989, and sold to Kinco Aviation, Inc., a company Dr. Howard established on September 24, 1989. Gov.'s Mem. at 24. The claimants have also moved for summary judgment regarding the aircraft, arguing that "[i]t is uncontroverted that the 1977 Piper Aztec Aircraft was paid for completely prior to Mildred Powell's death." Claimants' Opp'n at 8. Accordingly, the claimants argue, the airplane is not subject to forfeiture under 18 U.S.C. § 1981(a)(1)(C). *Id.* On the other hand, the government posits that because the airplane was used as collateral for the personal loan Dr. Howard obtained from First National Bank, and because the bank at one time held a lien on the airplane for its full value that was released only because Dr. Howard obtained a second mortgage on the defendant real estate, which was paid solely with tainted funds, it is subject to forfeiture. Pl.'s Mem. at 25.

The Court must draw all reasonable inferences in favor of the non-moving parties when considering the parties' cross motions for summary judgment. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). This principle precludes the Court from awarding summary judgment to either party as to the defendant aircraft. This result is called for because on the record currently before the Court it is unable to conclude as a matter of law that the defendant aircraft was "involved in a transaction in violation of section ... 1957 ... or ... traceable to [the funds illegally obtained]." 18 U.S.C. § 981(a)(1)(A).[19] The aircraft was clearly paid for prior to the commencement of Dr. Howard's fraudulent activities. And, although it was used by Dr. Howard to obtain his personal loan, it is not clear the loan's proceeds were used to pay the mortgage on the St. Joe, Florida property. In any event, it seems apparent, absent further briefing on the issue, that because the airplane was paid for with legitimately acquired funds, the value of the plane associated to those funds are not subject to forfeiture by the government. *United States v. Loe*, 49 F.Supp.2d at 523 (holding that because "52.6% of the purchase funds [were] tainted property, ... the United States' interest [was] limited to this portion."). The Court therefore cannot conclude, on the current record, that the government has established, by a preponderance of the evidence, that all or even part of the defendant aircraft is subject to forfeiture. Accordingly, the Court must deny both parties' summary judgment motions as to the aircraft.

**SO ORDERED** on this 21st day of Oc-

---

**19.** Property "derived from proceeds traceable to ... any offense constituting 'specified unlawful activity (as defined in section 1956(c)(7) ....' " is subject to forfeiture.) 18 U.S.C. § 981(C). Section 1956(c)(7)(A) enumerates both mail and wire fraud as "specified unlawful activity." It seems apparent that the aircraft was not initially acquired as a result of such activity and whether the events that resulted in the lien on the airplane being lifted warrant the forfeiture of the plane is an

tober, 2003.[20]

---

issue that specifically needs to be addressed by the parties.

20. An Order consistent with the Court's rulings was issued by the Court on September 30, 2003.